IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **ASSOCIATION OF O&C COUNTIES**, 16289 HWY 101 South Ste. A, Brookings OR 97415,<br><br>Plaintiff,<br><br>v.<br><br>**NEIL KORNZE**, Director, Bureau of Land Management, 1849 C Street NW, Washington D.C. 20240 and **S. M. R. JEWELL**, Secretary of the Interior, 1849 C Street NW, Washington, D.C. 20240,<br><br>Defendants. | Civil No.<br><br>Action for Declaratory and Injunctive Relief to Remedy Violations of the Oregon and California Railroad and Coos Bay Wagon Road Grant Lands Act of 1937, 43 U.S.C. § 1181a; the Federal Land Policy and Management Act, 43 U.S.C. § 1701, et seq.; and the Administrative Procedure Act, 5 U.S.C. §§ 551-706 |

## COMPLAINT

Plaintiff Association of O&C Counties ("AOCC" or "Plaintiff") for its complaint against

Defendants Neil Kornze, Director, Bureau of Land Management ("BLM") Hon. S. M. R. Jewell,

Secretary of the Interior ("Secretary"), states and alleges as follows:

## I.  INTRODUCTION

1.     This case arises out of the federal government's failure to comply with its

mandatory legal obligations to manage approximately 2.1 million acres of forest lands in

western Oregon for sustained yield timber production to produce revenue that is shared with

rural communities in Oregon.  In 1937, Congress mandated that all of these lands (the "O&C

Lands") classified as timberlands "shall be managed" for the purpose of "permanent forest

production" on a sustained yield basis and required that at least 50 percent of the proceeds from

the timber sales on such lands be paid to local county governments.  *See* Oregon and California

- 1 -

Railroad and Coos Bay Wagon Road Grant Lands Act of 1937 ("O&C Act"), 43 U.S.C. §§ 1181a-1181f.  Congress entrusted the Secretary to manage these O&C Lands, but with an express mandate: the timber "shall be sold, cut, and removed in conformity with the principal of sustained yield." *Id*. § 1181a.  Furthermore, to ensure adequate revenues to the counties, Congress expressly mandated that the amount of timber sold each year from the O&C Lands shall not be less than one half-billion board feet or the annual sustained yield capacity of those forests.  *Id*.

2.      As a result of the O&C Act, O&C Lands are managed differently from other forest lands under the jurisdiction of the Secretary and the Secretary's delegate, the BLM.  The BLM manages other forest lands by developing resource management plans ("RMPs") that provide for management based on the multiple-use provisions of the Federal Land Policy and Management Act ("FLPMA").  However, FLPMA expressly provides that the O&C Act prevails over any conflicting requirement in FLPMA "insofar as they relate to management of timber resources, and disposition of revenues from lands and resources." *Id*. § 1701(b) Savings Provision Note.  Thus, although the procedural aspects of FLPMA apply to the O&C Lands, such lands must be *s*ubstantively managed in accordance with the mandates of the O&C Act.

3.      On August 5, 2016, the Secretary, through the BLM, issued the Northwestern & Coastal Oregon Record of Decision and Resource Management Plan and the Southwestern Oregon Record of Decision and Resource Management Plan (the "2016 RMPs") governing 2.5 million acres of forest land in Oregon, including 2.1 million acres of O&C Lands.  Rather than complying with the express obligations of the O&C Act to manage the O&C Lands for permanent forest production on a sustained yield basis, however, the 2016 RMPs  improperly

set aside the vast majority of such lands for other purposes, primarily wildlife conservation. Indeed, the 2016 RMPs expressly designate wildlife conservation and the recovery of threatened and endangered species as one of the principal purposes of the RMPs and allow sustained yield timber production on *only 20 percent* of the entire planning areas (22 percent of the forest lands within the planning area).  And while the BLM itself acknowledges that its most recent estimate of the annual productive capacity from O&C Lands is at least 1.2 billion board feet per year, the 2016 RMPs contemplate a total harvest of no more than 278 million board feet per year, of which no more than 205 million board feet per year would be produced on a sustained yield basis.

4.      The BLM bases its decision to dedicate the majority of O&C Lands to reserves for wildlife conservation on the requirements of the Endangered Species Act of 1973, 16 U.S.C. §§ 1533 *et seq.* ("ESA").  But as the United States Supreme Court has held, the ESA "covers only discretionary agency actions and does not attach to actions . . . that an agency is <u>required</u> by statute to undertake once certain specified triggering events have occurred."  *National Ass'n of Home Builders v. Defenders of Wildlife*, 551 U.S. 644 (2007).  As a result, the ESA does not trump the statutory requirements of the O&C Act mandating that O&C Lands classified as timberlands "shall be managed" for the purpose of "permanent forest production" on a sustained yield basis, and that the amount of timber sold each year from the O&C Lands shall not be less than one half-billion board feet or the annual sustained yield capacity of those forests.  43 U.S.C. §§ 1181a-1181f

5.      By dedicating the majority of O&C Lands to reserves for wildlife conservation rather than permanent forest production on a sustained yield basis, the 2016 RMPs directly

- 3 -

violate the mandatory requirements of the O&C Act.  Furthermore, by restricting the annual

sustained yield harvest levels to no more than 205 million board feet, the 2016 RMPs violate the

statutory minimum timber sales required by the O&C Act.  Moreover, these statutory violations

have a direct, immediate, and injurious financial impact on the counties that depend on revenue

from timber sales from O&C Lands.  The 2016 RMPs are arbitrary, capricious, an abuse of

discretion, and otherwise contrary to law, and should be vacated and remanded to the Secretary

with instructions to comply with the statutory mandates of the O&C Act.

## II.  JURISDICTION AND VENUE

6.      The Court has jurisdiction of this action pursuant to 28 U.S.C. § 1331 (federal

question), 28 U.S.C. §§ 2201-2202 (declaratory judgment and injunctive relief).  Plaintiffs have

challenged final agency actions as defined by the Administrative Procedure Act, 5 U.S.C. § 701,

*et seq.* ("APA").

7.      Venue is proper in this Court pursuant to 28 U.S.C. § 1391(e) because this is an

action against United States agencies and officials and because a substantial part of the events

and omissions giving rise to the claims in this case occurred in this District, and the Defendants

reside in the District.  The records of decision adopting the 2016 RMPs were signed by Steven

A. Ellis, BLM Deputy Director (Operations), who also resides in the District.  Moreover, the

Secretary has been directly involved in making many of the land management decisions leading

to this lawsuit.

## III.  PARTIES

### A.   Plaintiff Association Of O&C Counties

8.      Plaintiff AOCC is an association whose members are 17 counties in western

Oregon containing O&C Lands managed by BLM and subject to the 2016 RMPs ("O&C

Counties")   AOCC's members include Klamath, Douglas, Curry, Coos, Lane, Lincoln, Linn,

Polk, Yamhill, Marion, Clackamas, Multnomah, Columbia, Washington, and Tillamook

Counties, all of which were formal cooperating agencies on the 2016 RMPs.  AOCC's sole

function is to protect and enhance the O&C Counties' interest in the O&C Lands.  AOCC (then

known as the O&C County Courts Association) was a proponent in the 1920s and 1930s for

reform of laws governing the O&C Lands and was actively involved in connection with the bill

introduced in 1937 that ultimately became the O&C Act.  AOCC has also participated actively in

every significant administrative or legislative process concerning such lands from 1937 to

present.  For example, most recently, AOCC represented the O&C Counties as "cooperating

agencies" in the BLM planning process that began in 2003 and ended in 2009, and again in the

planning process that generated the 2016 RMPs.

9.      AOCC's member counties are the intended beneficiaries of the O&C Act.  The

O&C Act expressly provides that the member counties have the right to 75 percent of gross

receipts from timber sales and harvests on O&C Lands, 43 U.S.C. § 1181f(a), which percentage

since the 1950s has been reduced to 50 percent by periodic Interior Appropriations Acts.  As

such, AOCC's members have a direct financial stake in the validity of the 2016 RMPs.  The

issuance of the 2016 RMPs in violation of the O&C Act causes, and will continue to cause,

immediate and direct financial harm to AOCC's member counties.  The 2016 RMPs improperly

ensure that most O&C Lands are set aside as reserves, and will not be managed for sustained yield timber production, thereby depriving AOCC's members of the receipts from timber sales from those lands as required by the O&C Act.  Because the annual timber sale quantity projected by the 2016 RMPs is less than half of the minimum amount required under the O&C Act, the 2016 RMPs will necessarily deprive the O&C Counties of millions of dollars of receipts from timber sales and harvests on O&C Lands each year.  They will also necessarily deprive the O&C Counties of timber supply that would support the wood products industries in those counties, resulting in increased levels of unemployment, as well as increased demand on certain services provided by the O&C Counties.

10.     The relief requested by AOCC will redress that harm by ensuring that the Secretary manages the O&C Lands by and through the BLM in accordance with the O&C Act for the intended purpose of permanent forest production on a sustained yield basis with the required statutory minimum level of timber harvest.   This relief will ensure that AOCC's members receive the receipts from timber sales promised by the O&C Act, and will further provide for the economic stability and development of the O&C Counties as contemplated by the O&C Act.

11.     AOCC and its member counties have no other plain, speedy, or adequate remedy at law.  The Secretary's decision in the 2016 RMPs to remove O&C Lands from sustained yield timber production and place those lands in reserves is final, and ripe for judicial review. Subsequent decisions by the Secretary to authorize individual timber sales will not further develop or clarify the decision to place lands in reserve, and delaying review would cause hardship to AOCC's members by further delaying entitlement to needed timber receipts.

- 6 -

**B.      Defendants**

12.      Defendant S.M.R. Jewell is the Secretary and the official charged with administering the O&C Act and FLPMA through the BLM.  Defendant Neil Kornze is the Director of the BLM and is responsible for issuing the 2016 RMPs (through BLM Deputy Director Steven A. Ellis).  Since 1993, several of the Secretary's predecessors including Bruce Babbitt and Ken Salazar were personally involved in various decisions concerning the O&C Lands including the decisions addressed in this complaint.

## IV.  BACKGROUND ALLEGATIONS

**A.      The Original O&C Land Grant And Its Impact On The O&C Counties**

13.      As part of the 19th Century push to settle the West, Congress authorized a railroad land grant in 1866 to connect Portland, Oregon to California by rail.  *See* Act of July 25, 1866, ch. 242, § 1, 14 Stat. 239.  Because railroad construction facilitated settlement, Congress granted the railroad companies the right to earn a land patent to every odd-numbered, alternate section of non-mineral public land within 20 miles on each side of the constructed railway line. If the government had previously disposed of the railroad's land selections, the railroad could acquire "in lieu" land sections within 10 miles of the original railway corridor. After obtaining land patents, the railroad company was required to sell the lands, but only to "bona fide and actual settlers."  Act of July 25, 1866, ch. 242, § 2.  The grant limited sales to actual settlers in the amounts no larger than 160 acres at a price of $2.50 per acre.

14.      In 1888, the Oregon and California Railroad ("Railroad") completed construction of the rail line from Portland to the California border.  By the time the line became operational over its entire length, the O&C Railroad had earned nearly 3,728,000 acres of land.  But the Railroad sold only a portion of such lands to actual settlers in 160-acre parcels for $2.50 per acre

as contemplated.  Instead, beginning in the 1880s, the Railroad began selling off much larger tracts of land at prices ranging between $5 and $40 per acre for timber speculation, in direct contravention to the statutory terms of the land grant.   The Railroad's sales to speculators became even more widespread in the 1890s.  Eventually, in 1903, the Railroad, which by then had been acquired by Southern Pacific Railroad, withdrew from sale all of the remaining lands intending to keep them for itself, asserting they were timberlands and unsuitable for settlement.

15.     The Railroad's refusal to sell additional O&C Lands had a detrimental impact on the settlement and development of the O&C Counties and was criticized by local governments. In response, the Oregon Legislature requested that Congress intervene to force the Railroad to resume land sales.

16.     In 1908, Congress responded by directing the U.S. Attorney General to enforce the terms of the O&C grant.  *See* S.J. Res. 18, 60th Cong., 35 Stat. 571 (1908).  But instead of forcing the Railroad to resume land sales, the Attorney General instituted an action seeking forfeiture of the unsold O&C Lands.  This action initially resulted in a decree that the O&C Lands were subject to forfeiture, *United States v. Or. & C.R. Co.,* 186 F. 861 (D. Or. 1911). Following the issuance of this decree, the Railroad stopped paying property taxes on the unsold O&C Lands, depriving the O&C Counties of critical and essential tax revenues.  Subsequently, in 1915, in *Oregon & California Railroad Co. v. United States*, 238 U.S. 393 (1915), the United States Supreme Court reversed the forfeiture decree, enjoined the Railroad from further sales of O&C Lands or timber, and invited Congress to formulate an appropriate remedy.

**B.     Initial Congressional Attempts To Provide Relief To The O&C Counties**

17.     Congress acted in 1916 by passing the Chamberlain-Ferris Act (39 Stat. 218), which revested all unsold O&C Lands (approximately 2.9 million acres) to the United States.

- 8 -

The Act also required the United States to pay the O&C Counties the unpaid property taxes owed on such O&C Lands and directed the Department of the Interior to sell the timber from those lands "as rapidly as reasonable prices [could] be secured" in a normal market.  Chamberlain-Ferris Act of 1916, ch. 137, § 4, 39 Stat. 218.  The Act also required that the remaining cutover timberland be sold for $2.50 an acre for purposes of settlement only, and not speculation.  Finally, because the O&C Counties would not be able to impose property taxes on the O&C Lands revested in the federal government, the Act also provided that a portion of the revenues from such timber and land sales would be directed to the O&C Counties.  Chamberlain-Ferris Act of 1916, ch. 137, §§ 9-10.

18.     But timber and land sales under the Chamberlain-Ferris Act produced little revenue.  As a result, the O&C Counties received no revenues in lieu of taxes after 1916 for almost 10 years, resulting in continued financial hardship.

19.     In 1926, at the urging of the O&C Counties, Congress responded by passing the Stanfield Act of July 13, 1926 (44 Stat., part 2, 915).  The Stanfield Act provided that the United States would make payments directly to the O&C Counties in lieu of property taxes with the proviso that such payments would ultimately be reimbursed to the government from the share of revenue that the counties were supposed to receive under the Chamberlain-Ferris Act.

20.     But this effort to resolve the O&C Counties' ongoing financial crisis failed as well.  Between 1926 and 1936, the O&C Counties' share of revenues was insufficient to reimburse the United States for the payments made under the Stanfield Act, resulting in an ever increasing reimbursable charge against the O&C Counties' share of revenues.

C.      **Congress Passes The O&C Act Of 1937**

21.     In 1936, the O&C Counties, through AOCC (formerly known as the O&C County

- 9 -

Courts Association), began pressing for further congressional action.  Congress responded yet

again by passing the O&C Act, which requires that the O&C Lands be managed for permanent

forest production on a sustained yield basis and which dedicates 75 percent of the resulting

revenues to the O&C Counties (which percentage has since the 1950s been periodically reduced

to 50 percent by Interior Appropriations Acts).  Specifically, the O&C Act provides that the

O&C Lands

> which have heretofore or may hereafter be classified as
> timberlands, and power-site lands valuable for timber, *shall* be
> managed . . . for permanent forest production, and the timber
> thereon shall be sold, cut, and removed in conformity with the
> principal of sustained yield  for the purpose of providing a
> permanent source of timber supply, protecting watersheds,
> regulating stream flow, and contributing to the economic stability
> of local communities and industries, and providing recreational
> facil[i]ties.

43 U.S.C. § 1181a (emphasis added).[1]  In addition, the O&C Act provides that no less than

"[f]ifty per centum" and up to 75 percent of the revenue obtained from such sales shall be

payable "to the counties in which the [O&C] lands revested . . . are situated."  *Id.* § 1181f(a).

22.     In a further effort to ensure that the O&C Counties would receive an adequate

stream of revenue, the O&C Act also expressly requires a minimum level of annual timber sales,

to ensure O&C Counties would receive a dependable level of shared harvest revenues.  At the

time of the enactment of the O&C Act, the best available estimate of the standing timber on

---

[1] As the Ninth Circuit Court of Appeals has held, this language makes "clear that the primary use of the revested lands is for timber production." *O'Neal v. United States,* 814 F.2d 1285, 1287 (9th Cir. 1987).  Thus, while the statute mentions additional benefits of sustained yield timber management such as protecting watersheds and recreation, there is nothing in the statute or its history to "suggest that wildlife habitat conservation or conservation of old growth forest is a goal on a par with timber production, or indeed that it is a goal of the O & C Act at all." *Headwaters, Inc. v. BLM, Medford Dist.*, 914 F.2d 1174, 1184 (9th Cir. 1990).  Instead, timber production is the "dominant use" of the O&C Lands. *Id.*

O&C Lands was approximately 50 billion board feet and the best estimate of the annual

sustained yield was at least 500 million board feet per year, based on an assumed 100-year

rotation period on the O&C Lands.  This reasoning is reflected in the statute:

> The annual productive capacity for such lands shall be determined
> and declared as promptly as possible after August 28, 1937, but
> until such determination and declaration are made the average
> annual cut therefrom shall not exceed one-half billion feet board
> measure: *Provided,* That timber from said lands in an amount not
> less than one-half billion feet board measure, or not less than the
> annual sustained yield capacity when the same has been
> determined and declared, shall be sold annually, or so much
> thereof as can be sold at reasonable prices on a normal market.

*Id.* § 1181a (underline added).

23.     The reasoning underlying this minimum harvest requirement is also reflected in

the legislative history of the 1937 O&C Act.  The underlined language in the above paragraph

was added to the O&C Act at the insistence of Representative Mott (of Oregon) and the AOCC.

As originally introduced in H.R. 5858 (75th Cong. (1937)), the O&C Act would have provided

only that: "The annual productive capacity shall be determined and declared as promptly as

possible after passage of this act, but until such determination and declaration are made, the

average annual cut shall not exceed on-half billion board feet."  While this language plainly

capped harvest in the short term, it provided no minimum cut.  Representative Mott noted this

and objected to any bill that would not provide minimum harvest levels needed to guarantee

adequate revenues for the O&C Counties.  *See* Report of Hearing from April 13, 1937, at 6-8,

25-27, 30.

24.     Similar objections were made by the witness for the AOCC.  Testifying before

Congress, the AOCC's attorney Guy Cordon offered the following language to provide a

minimum cut level:  "Timber from said lands in an amount not less than one-half billion board feet measure or not less than the maximum annual sustained yield capacity shall be sold annually if the same can be done at reasonable prices on a normal market."  Report of Hearings from May 25, 1937, at 121-22.  Representative Mott and Mr. Cordon both emphasized several times that the intent of the proposed amendment was to limit the Secretary's discretion and to guarantee a minimum harvest level for the benefit of the O&C Counties.  *Id*. at 122-24.

**D.     The BLM Initially Complies With The O&C Act**

25.     Following passage of the O&C Act, the Secretary immediately began to determine the inventory of standing timber and the proper classification of O&C Lands as timberlands or agricultural lands suitable for settlement.  By 1942, the Secretary, through the Department of the Interior, determined that 2,446,000 acres of O&C Lands were properly classified as "timberlands."  U.S. Department of Interior General Land Office, *Forever Timber: Perpetual Sustained Yield Forestry on the Revested Oregon and California Railroad Grant Lands and the Reconveyed Coos Bay Wagon Road Grant Lands in Western Oregon* (1945) at 17.

26.     The Secretary also proceeded to sub-divide the O&C Lands into six units, as expressly authorized by the O&C Act, to facilitate sustained yield management.  *See* 43 U.S.C. § 1181a ("If the Secretary of the Interior determines that such action will facilitate sustained-yield management, he may subdivide such revested lands into sustained-yield forest units, the boundary lines of which shall be so established that a forest unit will provide, insofar as practicable, a permanent source of raw materials for the support of dependent communities and local industries of the region . . . .").  The six units are Coos Bay, Eugene, Medford, Roseburg, Salem, and Lakeview.

27.     In addition, the Secretary immediately began identifying the annual productive

- 12 -

capacity of the O&C lands and marketing timber from such lands in accordance with the O&C

Act.  For example, in fiscal year 1940, the Secretary, through the Department of the Interior, sold

593 million board feet of timber (above the 500 million board feet minimum harvest

requirement).  W. Horning, *The O&C Lands and their Management, an Important Advance in*

*Forest Conservation* (U.S. Department of Interior General Land Office) (December 1940) at 7.

Over time, the allowable sale quantities were steadily increased until starting in 1959 the BLM

began selling an average of more than 1.1 billion board feet of timber from the O&C Lands

every year for the next 32 years, with the peak sale level of 1.662 billion board feet occurring in

1960.  *See* Final Environmental Impact Statement for the Revision of the Resource Management

Plans of the Western Oregon Bureau of Land Management WOPR (FEIS) (October 2008) at 3-

239-40.

        28.     The revenues from such timber sales provided substantial economic benefits to

the O&C Counties.  Indeed, in the first 50 years of implementation, the O&C Act returned more

than $1.4 billion to the O&C Counties.  Those funds were used to build and maintain public

buildings and construct other public works, and to support basic public services such as law

enforcement, corrections, public and mental health services, taxation and assessment, libraries,

and a broad array of other services supported by O&C County general fund budgets.

        29.     During this same time period, the Solicitor also acted consistently with the O&C

Act by repeatedly advising against any efforts to put the O&C Lands to uses other than timber

production.

        30.     For example, in 1940, the President proposed to withdraw a segment of O&C

Lands and include those lands as part of the Oregon Cave National Monument.  In a letter to the

Secretary, the Solicitor explained that "the President does not have such authority."  Solicitor

Opinion, March 9, 1940.  That is so because "Congress has set aside the lands for the specified

purposes" of timber production and "administration of the lands for national monument purposes

would be inconsistent with the utilization of the O. & C. lands as directed by Congress."  *Id.*

31.     Similarly the Solicitor concluded that O&C Lands could not be used for mining

purposes (*see* Department of Interior Memorandum, August 25, 1941), could not be withdrawn

for a state park (*see* Solicitor Opinion, May 17, 1955), and could not be included within

wilderness study areas otherwise required as part of FLPMA (*see* Solicitor Opinion, June 1,

1977).

32.     In addition, in 1986 the Solicitor issued an opinion to the Secretary on the issue of

whether the BLM could develop a program to conserve northern spotted owls on BLM-managed

land.  *See* Solicitor Opinion, October 28, 1986.  The Solicitor concluded that the BLM could

develop such a program consistent with the multiple use provisions of FLPMA.  But that

freedom was "limited" on any O&C Lands because "Congress defined how the Secretary must

manage" those lands under the O&C Act.  The Solicitor explained that the Secretary could

establish a program for managing spotted owls on O&C Lands "if it is possible to do so without

creating a conflict with the dominant use there – timber production."  *Id.*  However, "[i]f a

program for managing northern spotted owls conflicts with producing timber on a sustained basis

in O&C timberlands, the O&C Act will preclude the program's application to that realty."  *Id.*

**E.     The BLM Changes Course Following The Listing Of The Northern Spotted Owl As A Threatened Species Under The Endangered Species Act**

**1.     The Northwest Forest Plan And 1995 RMPs**

33.     In 1990, the U.S. Fish and Wildlife Service, acting under the Endangered Species

- 14 -

Act ("ESA"), listed the northern spotted owl as a threatened species throughout its range. 55

Fed. Reg. 26114 (June 26, 1990). In response to multiple lawsuits and other pressures, the

Secretary along with the Secretary of Agriculture adopted the 1994 Northwest Forest Plan to

govern all federal forests within the range of the northern spotted owl, including the O&C Lands.

34.     The 1994 Northwest Forest Plan was an ecosystem management plan for

managing habitat for late-successional and old-growth forest related species, including,

specifically, the northern spotted owl. Based on the 1994 Northwest Forest Plan, the BLM in

1995 amended the RMPs for the six O&C timber production units. Under the 1995 RMPs the

timberlands in the O&C Lands were no longer managed for permanent forest production on a

sustained yield basis consistent with the O&C Act. Instead, the 1995 RMPs created large

reserves of late successional forest lands to provide habitat for the northern spotted owl. As a

result the 1995 RMPs allowed sustained yield timber management on only 27 percent of the

O&C Lands. In so doing, the six RMPs reduced the annual sustained yield timber level on the

O&C Lands to a maximum of 211 million board feet, an 82 percent reduction from previous

levels. That level was later reduced to 203 million board feet. The actual harvest levels since

1995 have been even lower, averaging 144 million board feet, well below the sustained yield

level of the 1995 RMP's limited harvest base.

35.     The financial impact on the O&C Counties dependent on the revenues provided

by the O&C Act was immediate and devastating. To replace the lost revenues to the O&C

Counties, Congress since the mid-1990s has appropriated and made direct federal payments to

the counties in lieu of timber receipts. But the funding levels have steadily dropped over the

years. There is currently no congressional funding authorized to replace these lost revenues for

the federal fiscal year 2016 or beyond.  As a result of these lost revenues and the diminishing

federal payment program, rural western Oregon counties now face an unprecedented financial

crisis, with counties publicly discussing bankruptcy filings and forced into wholesale layoffs of

law enforcement and other county personnel.

> **2.**     **The 2008 Revisions To The 1995 RMPs**

36.     The American Forest Resources Council ("AFRC") and a number of timber

companies, as well as the AOCC, sued the Secretary over the 1994 Northwest Forest Plan in

*AFRC v. Caswell*, No. C94-1031 (D.D.C.) and *Ass'n of O&C Counties v. Babbitt*, No.C94-1044

(D.D.C), alleging in part that the Plan violated the O&C Act's mandate to manage the O&C

Lands for permanent forest production.  The parties ultimately settled those cases in 2003, with a

commitment by the Secretary to revise the 1995 RMPs for the O&C Lands.

37.     Pursuant to the settlement agreement, the BLM in 2005 proposed revisions to the

RMPs governing O&C Lands.  The BLM determined that the standing volume of timber on

O&C Lands at that time was 73.3 billion board feet.  The BLM determined that the annual

productive capacity of those O&C Lands was approximately 1.2 billion board feet of timber per

year.

38.     On December 30, 2008 the Secretary issued records of decisions approving the

RMP amendments for the six O&C timber production units.  The RMPs went into effect

immediately.  The records of decision for those six RMPs authorized the BLM to offer for sale

588 million board feet of timber per year, of which 502 million board feet per year would be

produced on a sustained yield basis over the life of the plan.  As a result, the 2008 RMPs

complied with the statutory minimum harvest requirements of the O&C Act.

39.     On July 16, 2009, however, the Department of Interior's Acting Assistant

Secretary of Interior for Land and Minerals Management withdrew the records of decision and

directed BLM to return to management of the O&C Lands under the 1995 RMPs.

40.     Several timber companies challenged the Secretary's withdrawal of the records of

decision in Federal District Court for the District of Columbia, and the court found that the

withdrawal had failed to comply with the procedural requirements of FLPMA. *See Douglas*

*Timber Operators, Inc. v. Salazar*, 774 F. Supp. 2d 245, 261 (D.D.C. 2011).  The court vacated

the withdrawal, and thereby reinstated the 2008 records of decision.

41.     Subsequent to that order, a federal district court in Oregon found that the 2008

records of decision were themselves improper and vacated them on grounds that the Secretary

had failed to initiate consultation under ESA section 7(a)(2).  *Pac. Rivers Council v. Shepard*,

03:11-CV-00442-HU, 2011 WL 7562961, at *10 (D. Or. Sept. 29, 2011), *report and*

*recommendation adopted as modified*, 03:11-CV-442-HU, 2012 WL 950032 (D. Or. Mar. 20,

2012).  Notably, the federal district court's ruling was limited to finding that the Secretary had an

obligation to consult under ESA section 7(a)(2) and it did not reach whether the Secretary's

wildlife conservation duties under the ESA could prevail over the mandatory obligations created

by the O&C Act.  Based on the court's decision, the 1995 RMPs were reinstated.

**3.      The 2016 Amendments To The 1995 RMPs**

42.     Following the decisions challenging the 2008 amendments and withdrawal, the

Secretary proceeded to develop updates to the 1995 RMPs in western Oregon that form the basis

of this lawsuit.  Instead of curing the failure of the 1995 RMPs to comply with the O&C Act, the

2016 RMPs perpetuate such violations, both by (a) reserving large sections of the O&C Lands

classified as timberlands for wildlife habitat rather than permanent forest production and (b)

failing to require the minimum harvest level called for by the O&C Act.

- 17 -

43.     The actions underlying the 2016 RMPs were initially developed and set forth in the "FEIS/Proposed Western Oregon Resource Management Plan" ("PRMP") for the revision of the 1995 RMPs for the six BLM districts in western Oregon, which was issued on April 12, 2016.  The formal announcement for the PRMP was published in the Federal Register on April 15, 2016.  The PRMP applies to 2.5 million acres of BLM-managed forest land in Oregon.  Of those lands, approximately 384,000 acres are public domain lands.  The remaining 2.1 million acres are O&C Lands (including approximately 75,000 acres of Coos Bay Wagon Road lands that must be managed the same as the revested O&C Lands).  *See* PRMP at 19.

44.     The PRMP inventories merchantable timber in the decision area since 1940.  *See id.* at 333.  The PRMP acknowledges that standing timber volume drastically *increased* on the O&C Lands between 1990 and 2006 (from 49.9 billion board feet to 64.8 billion board feet), in part due to the fact that harvest levels were far "below the maximum potential annual productive value."  *Id*.  Between 2006 and 2013, that inventory increased another 13 percent to 73.2 billion board feet.  *Id*. at 334.

45.     The PRMP also acknowledges the last estimate (from 2008) of the annual productive capacity of the O&C Lands, which was estimated at 1.2 billion board feet per year.  The PRMP explains that "[a]lthough there have been some changes in the decision area that would slightly alter these calculations resulting from timber harvest and growth since the calculations in the 2008 FEIS, these results provide an approximate outcome that is still relevant for the decision area."  *See id.* at 340.

46.     Despite acknowledging the increase in available standing timber on the O&C Lands and the annual productive capacity of approximately 1.2 billion board feet, the PRMP

- 18 -

designates the majority of O&C Lands for uses other than permanent timber production in direct contravention of the O&C Act.

47.     For example, the PRMP designates 948,866 acres (or 38 percent of the total area) as "Late Successional Reserves."  The PRMP prohibits  sustained yield timber production on all such reserved lands.  The management objectives of the Late Successional Reserve are to: (a) maintain nesting-roosting habitat for the northern spotted owl and nesting habitat for the marbled murrelet; (b) promote the development of nesting-roosting habitat for the northern spotted owl in stands that do not currently support northern spotted owl nesting and roosting; (c) promote the development of nesting habitat for the marbled murrelet in stands that do not currently meet nesting habitat criteria; and (d) promote the development and maintenance of foraging habitat for the northern spotted owl, including creating and maintaining habitat to increase diversity and abundance of prey for the northern spotted owl.

48.     The PRMP also designates 635,717 acres (or 26 percent of the total area) as "Riparian Reserves."  The PRMP removes these lands from sustained yield timber production. The management objectives of the Riparian Reserve are to (a) contribute to the conservation and recovery of ESA-listed fish species and their habitats and provide for conservation of Bureau Special Status fish and other special status riparian-associated species; (b)  maintain and restore riparian areas, stream channels, and wetlands by providing forest shade, sediment filtering, wood recruitment, stability of stream banks and channels, water storage and release, vegetation diversity, nutrient cycling, and cool and moist microclimates; (c) maintain water quality and stream flows within the range of natural variability, protect aquatic biodiversity, and provide quality water for contact recreation and drinking water sources; (d) meet ODEQ water quality

criteria; (e) maintain high-quality water and contribute to the restoration of degraded water quality downstream of BLM-administered lands; and (f) maintain high-quality waters within ODEQ designated Source Water Protection watersheds.

49.     Finally, the PRMP designates 263,647 acres (11 percent of the total area) as "Other Reserves."  The PRMP removes these lands from sustained yield timber production. These include, among other things, Special Recreation Management Areas designated by the BLM.

50.     Of the entire 2.5 million acre planning area, and 2.1 million acres suitable for timber production, the PRMP designates only 469,215 acres (22 percent of the lands suitable for timber production) as the "Harvest Land Base."  Moreover, even within the designated Harvest Land Base, actual harvest levels are further restricted for the protection of  species such as the northern spotted owl (and several others), and certain harvest practices are limited or prohibited. The PRMP optimistically projects that the annual sustained yield capacity for the Harvest Land Base is 205 million board feet per year, but even that harvest level is subject to uncertainties due to possible limitations imposed during future project-level ESA consultations between the BLM and the U.S. Fish and Wildlife Service and the National Marine Fisheries Service.

51.     Pursuant to BLM regulations, AOCC, on behalf of itself and its member counties, filed a protest with the BLM.  *See* 43 C.F.R. § 1610.5-2.  The BLM denied that protest on August 5, 2016.

52.     Based on the PRMP, on August 5, 2016, BLM issued two records of decision adopting the 2016 RMPs for the districts in Oregon containing all the O&C Lands.  The records of decision adopt the 2016 RMPs with only minor modifications from the PRMP.

- 20 -

53.     The 2016 RMPs perpetuate the errors of the PRMP by designating the majority of the planning area as "Late Successional Reserves" or "Riparian Reserves," leaving only 498,567 acres (the Harvest Land Base) to sustained yield timber production.  While this is a slight increase from the PRMP,  the move is temporary and reflects a decision to add lands into the Harvest Land Base that the Secretary predicts will be moved into Late Successional Reserves after surveys are completed.  With or without these lands, the 2016 RMPs still allocate less than 20% of the forest lands with the planning area to the Harvest Land Base.

54.     The records of decision for the 2016 RMPs also set the declared annual sales quantity for the Harvest Land Base at 205 million board feet, the same level provided for in the PRMP, which is only 41% of the 500 million board foot minimum required under the O&C Act. Moreover, the records of decision explain that actual sales volume may be reduced by as much as 40%, meaning that even this reduced harvest level is not likely to be achieved.

55.     The 2016 RMPs do not calculate an annual sales volume for any of other land allocations.  Instead, the 2016 RMPs confirm that such O&C Lands will not be managed for sustained yield timber production.

**F.     The ESA**

56.     In the 2016 RMPs and the records of decision associated with the 2016 RMPs, the BLM relies on the ESA to support its decision to designate the majority of timberlands in O&C Lands for wildlife preservation rather than permanent forest production pursuant to the mandates of the O&C Act.

57.     Congress originally enacted the ESA in 1973 with the intent of preserving threatened and endangered species.  *See Tenn. Valley Auth. v. Hill*, 437 U.S. 153, 177 (1978).

58.     Section 7 of the ESA (16 U.S.C. § 1536) places substantive obligations on all

- 21 -

federal agencies.  Specifically, section 7(a)(1) of the ESA requires all federal agencies to "utilize

their authorities in furtherance of the purposes of this chapter by carrying out programs for the

conservation of endangered species and threatened species." 16 U.S.C. § 1536(a)(1).  And

section 7(a)(2) requires all federal agencies to "insure that any action authorized, funded, or

carried out by such agency . . . is not likely to jeopardize the continued existence of any

endangered species or threatened species or result in the destruction or adverse modification of

habitat" listed as critical to that species.  *Id.* § 1536(a)(2).  Consistent with this obligation, the

ESA requires all federal agencies to consult with either the U.S. Fish and Wildlife Service or the

National Marine Fisheries Services on any discretionary action that may affect listed species.  *Id.*

59.     The obligations of section 7 of the ESA, however, do not implicitly repeal pre-

existing statutory mandates, such as those contained in the O&C Act, which require both that the

O&C Lands (1) "*shall* be managed . . . for permanent forest production, and the timber thereon

*shall* be sold, cut, and removed in conformity with the principal of sustained yield," and (2) that

"timber from said lands in an amount not less than one-half billion feet board measure, or not

less than the annual sustained yield capacity when the same has been determined and declared,

*shall* be sold annually."  43 U.S.C. § 1181a (emphases added).  This result is clear from the

United States Supreme Court's ruling in *National Ass'n of Home Builders v. Defenders of*

*Wildlife*, 551 U.S. 644 (2007), which states in part:

> §7(a)(2)'s no-jeopardy duty covers only discretionary agency
> actions and does not attach to actions . . that an agency is <u>required</u>
> by statute to undertake once certain specified triggering events
> have occurred.  This reading not only is reasonable, inasmuch as it
> gives effect to the ESA's provision, but also comports with the
> canon against implied repeals [of other earlier, conflicting
> legislation] because it stays §7(a)(2)'s mandate where it would
> effectively override otherwise mandatory statutory duties.

- 22 -

*Id.* at 669.

60.     The reasoning in *Home Builders* is directly applicable to the Secretary's management of O&C Lands.  The Secretary is required, by the O&C Act, to manage all O&C Lands classified as timberlands for sustained yield timber production, and to offer the statutory minimum amount of timber for sale each year.  The Secretary may not modify those mandatory obligations to meet the wildlife conservation goals or obligations of the ESA.

61.     While the Secretary may have discretion to devise a course of action that complies with both the ESA and the O&C Act, the Secretary lacks discretion to select a course of action that violates the sustained yield and minimum sales requirements of the O&C Act.  The Secretary's decision in the 2016 RMPs to remove nearly 80 percent of O&C Lands from sustained yield timber production and to authorize sales at less than half of the statutory minimum fails to meet the requirements of the O&C Act, and the ESA provides no basis to justify that statutory failure.

**G.     The APA**

62.     The APA authorizes courts reviewing agency action to hold unlawful and set aside final agency action, findings, and conclusions that are arbitrary and capricious, an abuse of discretion, or otherwise not in accordance with law.  5 U.S.C. § 706(2)(A).  RMPs are reviewed under this provision of the APA.

**FIRST CLAIM FOR RELIEF**

**The 2016 RMPs Violates The O&C Act And The APA By Reserving O&C Lands From
Timber Production**

63.     Plaintiff re-alleges and incorporates by reference the preceding paragraphs.

64.     The O&C Act requires the Secretary to manage all O&C Lands under the

- 23 -

jurisdiction of the Department of the Interior that are classified as timberlands and power site lands valuable for timber for permanent forest production, and the timber thereon shall be sold, cut, and removed in conformity with the principle of sustained yield.  43 U.S.C. § 1181a.

65.     The 2016 RMPs allocate approximately 78 percent of all timberlands to reserves in which sustained yield timber production is not allowed.  Reservations such as the Late Successional Reserve and the Riparian Reserve remove lands from permanent forest production for the purpose of species conservation.  Only 22 percent of the O&C Lands suitable for timber production are designated for permanent forest production.

66.     The Secretary's decision, by and through the BLM, in the 2016 RMPs to remove 78 percent of all timberlands from sustained yield timber production violates the O&C Act, and is otherwise arbitrary, capricious, and an abuse of discretion and contrary to law in violation of APA, 5 U.S.C. §§ 701-706.  Under the O&C Act, the Secretary lacks the discretion to designate the O&C Lands for uses other than sustained yield timber production, and "[e]xempting certain timber resources from harvesting to serve as wildlife habitat[] is inconsistent with the principle of sustained yield."  *Headwaters, Inc. v. BLM, Medford Dist.*, 914 F.2d 1174, 1183 (9th Cir. 1990).

67.     Moreover, even if the Secretary had discretion to designate some of the O&C Lands for uses other than sustained yield timber production (and there is no such discretion), the O&C Act makes plain that timber production is the "dominant use" for O&C Lands.  *Id.* at 1183-84.  Accordingly, the Secretary's decision, by and through the BLM, in the 2016 RMPs to relegate sustained yield timber production to only 22 percent of the O&C Lands still violates the O&C Act, and is otherwise arbitrary, capricious, and an abuse of discretion and contrary to law

- 24 -

in violation of APA, 5 U.S.C. §§ 701-706.

## SECOND CLAIM FOR RELIEF

**The 2016 RMPs Violates The O&C Act And The APA By Failing To Ensure Compliance With Statutory Minimums For Timber Sales**

68.    Plaintiff re-alleges and incorporates by reference the preceding paragraphs.

69.    The O&C Act sets a statutory minimum level of timber sales that must be offered annually on O&C Lands: "timber from said lands in an amount not less than one-half billion feet board measure, or not less than the annual sustained yield capacity when the same has been determined and declared, shall be sold annually, or so much thereof as can be sold at reasonable prices on a normal market."  43 U.S.C. § 1181a.

70.    The most recent calculation by BLM of annual sustained yield capacity for the O&C Lands is 1.2 billion board feet per year.  Accordingly, the statutory minimum that must be offered for sale each year is either "an amount not less than one-half billion feet board measure" or "not less than" 1.2 billion board feet per year.

71.    The 2016 RMPs foreclose the possibility that BLM can meet either statutory minimum by restricting sustained yield timber production to 22 percent of the O&C Lands.  The projected annual sustained yield capacity for that limited subset of O&C Lands is only 205 million board feet per year.  Accordingly, the Secretary's decision, by and through the BLM, in the 2016 RMPs to relegate sustained yield timber production to only 22 percent of the O&C Lands suitable for timber production results in a violation of the statutory minimum for timber sales set in the O&C Act, and is otherwise arbitrary, capricious, an abuse of discretion, and contrary to law in violation of APA, 5 U.S.C. §§ 701-706.

86456441.7 0023461-00003

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment as follows:

A.     Adjudge and declare that the Secretary has violated the O&C Act by reserving O&C Lands from sustained yield timber production and that the 2016 RMPs are therefore arbitrary, capricious, an abuse of discretion, and contrary to law;

B.     Adjudge and declare that the Secretary has violated the O&C Act by failing to ensure that the 2016 RMPs provide for the required statutory minimum level of annual timber sales, and that the 2016 RMPs are therefore arbitrary, capricious, an abuse of discretion, and contrary to law;

C.     Vacate and remand the 2016 RMPs with instructions to prepare RMPs that comply with the O&C Act's requirements;

D.      Award Plaintiff its reasonable attorneys' fees and costs pursuant to the Equal Access to Justice Act, 28 U.S.C. § 2412; and

E.     Grant Plaintiff such further relief as may be just, proper, and equitable.

DATED:  August 5, 2016.

STOEL RIVES LLP


_s/ Per Ramfjord_
Per Ramfjord, (D.C. Bar No. 392237)
760 SW Ninth Avenue, Suite 3000
Portland, OR 97205
Phone: (503) 294-9257
Email:  per.ramfjord@stoel.com


Attorneys for Plaintiff

- 26 -